In the

# United States Court of Appeals

## For the Seventh Circuit

No. 08-1540

CHRISTINE SANDAGE, *et al.*,

*Plaintiffs-Appellants*,

*v.*

BOARD OF COMMISSIONERS OF
 VANDERBURGH COUNTY, *et al.*,

*Defendants-Appellees*.

Appeal from the United States District Court
for the Southern District of Indiana, Evansville Division.
No. 3:07-CV-00049 SEB-WGH—**Sarah Evans Barker**, *Judge*.

ARGUED OCTOBER 24, 2008—DECIDED NOVEMBER 24, 2008

Before EASTERBROOK, *Chief Judge*, and POSNER and
ROVNER, *Circuit Judges*.

POSNER, *Circuit Judge*.   The plaintiffs' decedents,
Sheena Sandage-Shofner and Alfonzo Small, along with
a third person, were murdered in Sandage-Shofner's
apartment by a man named Moore, who then killed
himself. Moore had been serving a four-year sentence, in
the custody of the county sheriff, for robbery. But he was

on work release, employed cleaning parking lots. It was while he was on work release that he committed the murders. Twice—once one month before the murders, the other time two days before—Sandage-Shofner had called the sheriff's department to complain that Moore was harassing her. (The nature of the harassment, and of Moore's relationship to the victims, are unclear.) The plaintiffs, in this suit under 42 U.S.C. § 1983 against county officials, claim that the department's failure to act on the complaint of harassment by revoking Moore's work-release privilege and reimprisoning him deprived their decedents of their lives without due process of law, in violation of the Fourteenth Amendment. The district judge dismissed the complaint for failure to state a claim. Fed. R. Civ. P. 12(b)(6).

We assume, given the procedural posture, that the defendants were reckless in failing to act on the complaint of harassment. (If they were merely negligent, the plaintiffs would have no case.) The judge was nevertheless right to dismiss the suit. There is no federal constitutional right to be protected by the government against private violence in which the government is not complicit. So the Supreme Court held in *DeShaney v. Winnebago County Dept. of Social Services*, 489 U.S. 189 (1989), affirming a decision by this court, in which the principle was already well established. In *Bowers v. DeVito*, 686 F.2d 616, 618 (7th Cir. 1982), for example, we had said that while "there is a constitutional right not to be murdered by a state officer, for the state violates the Fourteenth Amendment when its officer, acting under color of state law, deprives a person of life without due process of law, . . . there is

no constitutional right to be protected by the state against being murdered by criminals or madmen . . . . The Constitution is a charter of negative liberties; it tells the state to let people alone; it does not require the federal government or the state to provide services, even so elementary a service as maintaining law and order." See also *Jackson v. City of Joliet*, 715 F.2d 1200 (7th Cir. 1983). There is a moral right to such services—protection against violence is the single most important function of government—and a government that fails in this duty invites well-deserved political retribution. But there is no enforceable federal constitutional right.

Such a right would be impractical. The federal courts would have to decide how much money each state and every local community would be required to allocate to protection of life, limb, and property. They would have to decide how much money must be appropriated for police and prosecutors and prisons, how police resources should be deployed across neighborhoods, the minimum length of state prison sentences, when if ever probation or parole should be substituted for imprisonment or a prison sentence suspended, and which state prisoners should be allowed to serve part or all of their sentences in halfway houses, at home, or on work release. The federal courts would fix the speed limits on state highways, prescribe the lighting on state streets, regulate fire departments, public hospitals, and paramedic services.

In *Jackson v. City of Joliet*, *supra*, the car driven by one of the plaintiff's decedents (the other was a passenger) crashed and burst into flames. A policeman arrived

quickly but failed to notice that the car was occupied, and so the occupants died. We held that the policeman's failure to save them, even if reckless, was not actionable under the Constitution because he had not placed them in danger but had merely failed to rescue them. And in *Tuffendsam v. Dearborn County Board of Health*, 385 F.3d 1124, 1126-27 (7th Cir. 2004), where the claim was that the county had failed to enforce a law against discharging sewage into groundwater, and as a result the value of the plaintiff's property had declined, we said that "the root objection to cases of this kind, as noted by the district judge, is simply the infeasibility of judicial review of law enforcement. To evaluate the gravity, the unreasonableness, the gratuitousness of the county health board's failure to cause a previous owner of the plaintiff's house to abate the discharge of sewage, or of the board's failure to induce through prompt and vigorous legal action the neighbors to contribute to the expense of building a sewer line, would place the federal courts in control of sanitation in Dearborn County, Indiana, responsible for telling the County's public health officers how to allocate their limited time and money among the various public health problems clamoring for their attention. Judge Hamilton [the district judge] would be the Dearborn County health board."

No one has a federal constitutional right to have another person jailed (or, in *DeShaney* itself, to be protected against an abusive parent). *Town of Castle Rock v. Gonzales*, 545 U.S. 748, 768 (2005) ("the benefit that a third party may receive from having someone else arrested for a crime generally does not trigger protections under the

Due Process Clause"); *Leeke v. Timmerman*, 454 U.S. 83 (1981); *Linda R.S. v. Richard D.*, 410 U.S. 614, 619 (1973). In *Castle Rock*, a case much like this one, the police refused to enforce a domestic-abuse restraining order, despite repeated demands by the woman against whose husband the order was directed, and he murdered the couple's three children; yet the Supreme Court held that the refusal was not a denial of due process. The technical question was whether the State of Colorado had created a property right in the enforcement of restraining orders, and the Court found that it had not. Without such a right—not even claimed in this case—there could be no possible violation of the due process clause. Our plaintiffs make the similar claim that the county was constitutionally required to revoke Moore's work release and return him to custody. A dangerous person, the plaintiffs argue, must not be left at large. The case would be the same (and identical to *Castle Rock*) if Moore had not been serving a sentence but had threatened Sandage-Shofner and she had complained to the sheriff's department, the department had referred the matter to the county prosecutor, and he had decided in a misguided exercise of his prosecutorial discretion not to order Moore arrested and charged. It would be the same case if Sandage-Shofner had been Moore's child and the county welfare authorities had allowed her to remain in his custody though they suspected him of abusing her—that would be *DeShaney*, and the actual case before us is indistiguishable from it.

It is true that while there's no federal constitutional duty to protect or (as in *Jackson*) to rescue from a peril that the

government did not create, there is a duty not to harm illustrated by *White v. Rochford*, 592 F.2d 381 (7th Cir. 1979). Police arrested a driver but left his child passengers stranded in the driverless car, thus placing them in peril for the consequences of which the police were held liable under section 1983. The myriad cases that hold jailers liable for injuries resulting from deliberate indifference to the medical needs of their prisoners or from assaults by other inmates are similar. All are cases in which, before the police or other public authorities act, the plaintiff is safe. "[T]he Constitution does not require the government to protect citizens from privately created danger. It may, however, demand protection if the state disables people from protecting themselves; having rendered someone helpless, the state must supply the sort of defenses that the person could have provided on his own. So, for example, if the state imprisons someone and prevents him from obtaining medical care from private physicians and hospitals, then the state must supply medical care for serious problems. If the state takes a child from his parents and places him involuntarily with a foster family, it must take precautions to reduce the chance that the foster parents will abuse the child . . . . If the state forbids private rescue of a drowning man, then the state must furnish a competent rescue service of its own." *Witkowski v. Milwaukee County*, 480 F.3d 511, 513 (7th Cir. 2007) (citations omitted).

Some cases distinguish between the state's duty not to inflict harm and its duty to protect someone whom it has rendered defenseless, and describe the second as a case in which there is a "special relationship" between the

state and the person whom it failed to protect that created a federal constitutional duty. E.g., *King v. St. Louis School Dist. 189*, 496 F.3d 812, 817 (7th Cir. 2007); *Shanks v. Dressel*, 540 F.3d 1082, 1088 n. 5 (9th Cir. 2008). But functionally the two classes of case are the same, and in *Archie v. City of Racine*, 847 F.2d 1211, 1223 (7th Cir. 1988) (en banc), we disapproved the use of the term "special relationship," which we called a "magic phrase" (and we do not believe in magic). For in both classes of case the victim is safe before the state intervenes and unsafe afterward. This is true even in the hypothetical case that we mentioned in *K.H. through Murphy v. Morgan*, 914 F.2d 846, 849 (7th Cir. 1990): "If the fire department rescues you from a fire that would have killed you, this does not give the department a constitutional license to kill you, on the ground that you will be no worse off than if there were no fire department." Were there no public fire departments, there would be private ones. "Having put the citizen on the defensive, or having stripped away avenues of self-help, the state must afford a procedure reasonably likely to reach an accurate conclusion even if that means the implication of positive rights from negative ones. When the government does not monopolize the avenues of relief, or when it has already afforded process sufficient to yield accurate decisions, it has no further obligation to give aid." *Archie v. City of Racine*, *supra*, 847 F.2d at 1222. Our plaintiffs' decedents were not safe before the defendants failed to revoke Moore's work release. They were in danger—from Moore—and the defendants had done nothing to restrict the victims' "avenues of self-help."

The plaintiffs' best case is *Monfils v. Taylor*, 165 F.3d 511 (7th Cir. 1998). Monfils had tipped off the police to a thief

at his workplace in a phone call that the police recorded. He repeatedly begged the police not to release the tape to anyone because the thief was a violent person who would recognize his voice. He was assured it would not be released. The thief, however, requested a copy of the tape from the police, and a policeman who did not know about Monfils's fears gave it to him. So the thief discovered that Monfils was the informant—and killed him. We upheld a jury verdict for the plaintiff because Monfils was safe (or at least much safer) before the police released the tape, without which the thief would have been unlikely to identify the informant. By the act of releasing the tape the police created the mortal danger to Monfils. In this case, in contrast, the danger was created by Moore, and by Moore alone; the defendants merely failed to take any steps to reduce the danger. They failed in their moral duty to protect members of the public from private violence, while the police in *Monfils* took a step—releasing the tape—that either created or greatly increased a danger of private violence.

Seeking to blur the distinction, the plaintiffs argue, though only in their reply brief and there only in passing, that "it is certainly a plausible explanation for these tragic events that Moore was angry at Sheena Sandage-Shofner for calling the Sheriff's Department and warning them that Moore was violating his work release." But they do not allege that (like Monfils) their decedents requested anonymity or even that the sheriff's department told Moore that it was Sandage-Shofner who had called. Nor did Sandage-Shofner warn the sheriff's department that Moore might become violent if he knew that she had complained.

*Monfils*, moreover, may well have been superseded by *Castle Rock*. Although the Supreme Court as we said rejected the argument that Colorado had created a right to the enforcement of restraining orders, the Colorado statute that was claimed to create the right did say that "a peace officer shall use every reasonable means to enforce a valid restraining order," 545 U.S. at 759, and it is hard to see what difference there is between a statute that commands enforcement and the promise not to endanger Monfils by revealing that he was the informant. In both cases there is a commitment to protect, and if the statutory commitment is not enforceable under the Fourteenth Amendment, it is difficult to see why a promise should be.

The plaintiffs also rely on our recent decision in *King v. St. Louis School Dist. 189*, *supra*, not for its facts, which bear no relation to those of this case, but for the principles that the court distilled from the case law to determine whether the plaintiff can complain under the Fourteenth Amendment of a failure to protect: first, "the state, by its affirmative acts, must create or increase a danger faced by an individual. Second, the failure on the part of the state to protect an individual from such a danger must be the proximate cause of the injury to the individual. Third, . . . the state's failure to protect the individual must shock the conscience." 496 F.3d at 818 (citations omitted). The second principle, while certainly sound, is a general requirement for relief in a tort suit rather than anything special to the *DeShaney* line of cases. The third principle, as the opinion goes on to explain, is a reminder that liability for a constitutional tort requires

proof that the defendant acted (or failed to act) not merely negligently but recklessly (equivalently, with "deliberate indifference" to the risk of harm that he was creating). *Id*. at 818-20.

The first principle is thus the key one, and its requirement of "affirmative acts" distinguishes our case from *Monfils*. We add only that "create *or increase*" must not be interpreted so broadly as to erase the essential distinction between endangering and failing to protect. If all that were required was a causal relation between inaction and harm, the rule of *DeShaney* would be undone, *Lockhart-Bembery v. Sauro*, 498 F.3d 69, 77 (1st Cir. 2007), since, had it not been for the state's inaction in *DeShaney*, there would have been no injury. The three cases that the opinion in *King* cites for the proposition that the state must by its "affirmative acts . . . create or increase" the danger to the victim—*Windle v. City of Marion*, 321 F.3d 658 (7th Cir. 2003); *Bright v. Westmoreland County*, 443 F.3d 276 (3d Cir. 2006), and *Monfils*—are either cases, like this one, of inaction by law enforcement personnel (*Windle* and *Bright*), so that there was no liability, or a case (*Monfils*) in which law enforcement personnel were responsible for the danger. When courts speak of the state's "increasing" the danger of private violence, they mean the state did something that turned a potential danger into an actual one, rather than that it just stood by and did nothing to prevent private violence. That was *Monfils*; it is not this case; and after *Castle Rock* a broken promise—the essential act of which both the plaintiff in that case and the present plaintiffs complain (though there was more

in *Monfils*—the handing over of the tape to the murderer)—may very well not be enough.

AFFIRMED.